UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALASKA INDUSTRIAL DEVELOPMENT AND EXPORT AUTHORITY,<br><br>                   Plaintiff,<br><br>      v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>                   Defendants. | Case No. 23-cv-3126 (JMC) |

## MEMORANDUM OPINION

In late 2021, the Alaska Industrial Development and Export Authority (AIDEA) sued President Joe Biden, the U.S. Department of the Interior (DOI), and the Bureau of Land Management (BLM) in the District of Alaska, challenging the Biden Administration's "temporary halt on all Department activities related to the [Coastal Plain Oil and Gas Leasing] Program" in the Arctic National Wildlife Refuge in Alaska. *See AIDEA v. Biden* (*AIDEA I*), No. 3:21-cv-00245 (SLG), 2023 WL 5021555, at *3 (D. Alaska Aug. 7, 2023).[1] Under this temporary moratorium, Plaintiff could not make use of the seven leases it had acquired for gas and oil exploration in the Refuge and was forced to wait while Defendants conducted "supplemental environmental review aimed at correcting alleged legal deficiencies" in the "underlying record supporting the leases." *Id.* at *3–4. The District of Alaska rejected the AIDEA's challenge, concluding that it was "well

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

within DOI's authority to issue leases pursuant to the Program and to pause lease implementation to address legal errors that could lead a federal court to reject the Program." *Id.* at *25.

The AIDEA now sues the DOI and BLM again, this time in the District of Columbia, and this time challenging Defendants' recent decision to cancel the leases after "determin[ing] that the leases were improperly issued due to pre-leasing legal defects." ECF 11 ¶ 39. While Defendants have already filed an answer and administrative record, ECF 20; ECF 18, they have also moved to transfer this action to the District of Alaska, arguing that the situs of Plaintiff, Plaintiff's prior lawsuit, and the Refuge itself is the superior forum, ECF 7. This Court agrees. Despite the AIDEA's contrary position, ECF 10, it makes little sense to adjudicate this matter in a forum to which Plaintiff has no connection when the subject matter of the lawsuit sits in another state, on the other side of the continent, and where a court has already ruled on a similar dispute involving these very Parties.

As such, and for the reasons set out below, the Court will **GRANT** the Government's motion to transfer to the U.S. District Court for the District of Alaska.

I.     BACKGROUND

The Arctic National Wildlife Refuge is a federally protected wildlife area spanning approximately 18.9 million acres of land in the northeast corner of Alaska. *Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-00204 (SLG), 2021 WL 46703, at *1 (D. Alaska Jan. 5, 2021) (citing 16 U.S.C. § 3101 *et seq.*). Within the Refuge, approximately 1.5 million acres bordering the Beaufort Sea are designated as the Coastal Plain, an area which Congress has long recognized as a region with potential for "oil and gas exploration, development, and production." 16 U.S.C. § 3142 (codifying Section 1002 of the Alaska National Interest Lands Conservation Act

2

(ANILCA), Pub. L. 96-487 (Dec. 2, 1980)).[2] For decades, however, the actual production of oil and gas from the Refuge was prohibited, and "no leasing or other development leading to production of oil and gas from the range [would] be undertaken until authorized by an Act of Congress." *Id.* § 3143.

In 2017, Congress passed such an Act authorizing (and in fact mandating) an oil and gas program in the Refuge. In Section 20001(b)(2)(A) of Public Law 115-97, otherwise known as the Tax Cuts and Jobs Act of 2017, Congress instructed the Secretary of the Interior to "establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." Over the next three years, the DOI issued a final environmental impact statement, published a Record of Decision, and opened up competitive bidding for various tracts of land on the Plain. ECF 11 ¶¶ 18–19. Several environmental organizations filed suit in the District of Alaska to enjoin the leasing program, but none were successful. *See, e.g.*, *Gwich'in Steering Comm.*, 2021 WL 46703, at *1 (single order denying preliminary injunction motions in "three [separate] actions" brought by distinct plaintiffs); *State of Washington v. Haaland*, No. 3:20-cv-00224 (SLG) (D. Alaska) (similar lawsuit filed September 9, 2020, but with no motion for preliminary injunction). The lease sale occurred on January 6, 2021, as planned. *AIDEA I*, 2023 WL 5021555, at *2. Three bidders took part, *id.*, including the AIDEA—a public corporation created by the Alaskan legislature to "promote,

---

[2] The Court cannot help but acknowledge that the exact boundaries of the Coastal Plain have been a topic of confusion and controversy. While ANILCA defined the Coastal Plain as the "area identified as such in the map entitled 'Arctic National Wildlife Refuge,' dated August 1980," 16 U.S.C. § 3142(b)(1), that 1980 map has been missing for decades. Congress has relied on new maps since the loss of the original, *see* CRS Report RL33872, *Arctic National Wildlife Refuge (ANWR): An Overview* at 7 & n.32 (citing CRS Report RS22326, *Legislative Maps of ANWR*), but these new maps have raised concerns for some, *see, e.g.*, Felicity Barringer, *Arctic Map Vanishes, and Oil Area Expands*, N.Y. TIMES (Oct. 21, 2005). That said, the 2017 law at the center of this dispute leaves no doubt that the Coastal Plain is now defined by reference to two new, presumably extant maps "dated October 24, 2017." *See* Pub. L. 115-97, Section 20001(a) (stating that these maps are "on file with the United States Geological Survey and the Office of the Solicitor of the Department of the Interior").

3

develop, and advance the general prosperity and economic welfare of the people of the state," Alaska Stat. §§ 44.88.020, 44.88.070. After bids were reviewed, the AIDEA was awarded the opportunity to enter lease agreements for nine tracts of land and chose to enter agreements for seven (two tracts went to the remaining two bidders). *AIDEA I*, 2023 WL 5021555, at *2; ECF 11 ¶¶ 19–20. However, this victory was short lived.

Two weeks after the AIDEA was awarded its leases, the Coastal Plain Program came to a halt. On January 20, 2021, under a new presidential administration, the DOI revisited the Program to investigate its concerns that the prior environmental impact statement was insufficient and that the issuing of leases was unlawful. *AIDEA I*, 2023 WL 5021555, at *2–3. Pending supplemental environmental review, the DOI announced a "temporary moratorium" on the Program, during which it would suspend all leases and associated operations. *Id.* at *3. With the long-term viability of these newly awarded leases in question, the BLM gave lessees an opportunity to cancel their leases and receive refunds of their bids. *Id.* Two bidders took that deal, but the AIDEA declined, choosing instead to try its luck in the courts. *Id.* at *3, *17.

On November 4, 2021, after failing to obtain authorization from the DOI to proceed with oil and gas exploration pursuant to the Program leases, the AIDEA sued President Biden, the DOI, and the BLM in the District of Alaska to challenge the temporary moratorium. *Id.* at *3. According to the AIDEA, Defendants had no authority to suspend these leases, and their decision to do so was contrary to the Tax Act's mandate to establish an oil and gas program on the Coastal Plain. *Id.* at *5–6. The District of Alaska viewed the statutory scheme differently, reading the Tax Act as a "broad grant of authority" for the Agency to administer the Program, "provided it does so in accordance with all applicable federal laws." *Id.* at *9. While the court had no moment to decide "whether Agency Defendants ha[d] the authority to *cancel* [the] leases," *id.* at *25 (emphasis

4

added), it expressly rejected the notion that it was somehow "invalid" for the DOI to suspend the leases in order to consider doing exactly that, *id.* at *14. The District of Alaska acknowledged that the Tax Act had some specific guidelines (e.g., two deadlines for lease sales), but found "no indication" in the statute that the DOI lacked the "authority to correct administrative errors," particularly given "the limited nature of a leasehold interest in [public] lands." *Id.* (citing *Boesche v. Udall*, 373 U.S. 472, 476, 478, 485 (1963)). After giving due consideration to the AIDEA's myriad arguments, the District of Alaska rejected all of them, granting summary judgment to the federal defendants. *Id.* at *29.

Not long after the District of Alaska's ruling, the DOI (perhaps predictably) cancelled the seven leases held by the AIDEA, and the AIDEA filed suit in this Court shortly thereafter. ECF 1 (original complaint filed October 18, 2023). The AIDEA alleges that the DOI's decision to cancel the leases violates the Tax Act's mandate, that the lease termination is disproportionate to the alleged legal defects of the environmental record undergirding the leases, and that the DOI failed to provide the AIDEA with due process prior to cancellation. *See, e.g.*, ECF 11 ¶¶ 48–50, 54, 60, 66, 73. Defendants now move to transfer this case to the District of Alaska, arguing that this action's acute impact on the Alaskan environment and economy, the relevance of the prior litigation, and Plaintiff's strong ties to Alaska (and lack of ties to D.C.) all support transfer. ECF 7. Plaintiff opposes, pointing to the national importance of the Refuge, the distinct agency action at issue in this case, and the involvement of high-level DOI officials in Washington, D.C. ECF 10. After reviewing the Parties' briefs, the Court is prepared to rule on the motion.

## II.   LEGAL STANDARD

Pursuant to 28 U.S.C. § 1404(a), this Court may, "[f]or the convenience of parties and witnesses, in the interest of justice . . . transfer any civil action to any other district or division

where it might have been brought." A party moving for such a transfer bears the burden of establishing that its proposed venue is appropriate. *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978). That is, the moving party must establish that the action "might have been brought" in that venue and that transferring the action there would, on balance, "prevent the waste of time, energy, and money and . . . protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). To that end, the decision of whether to transfer an action, which falls "within the broad discretion of the district court," is guided by a set of private interest and public interest factors. *Virts v. Prudential Life Ins. Co. of Am.*, 950 F. Supp. 2d 101, 104 (D.D.C. 2013) (citing *Van Dusen*, 376 U.S. at 622).

## III.  ANALYSIS

The Court finds that transfer to the District of Alaska is warranted. For starters, there is no dispute that this case could have been brought in the District of Alaska. ECF 10 at 4; ECF 14 at 2. The Refuge—i.e., the "property that is the subject of the action" per the terms of Plaintiff's cancelled leases—is situated in Alaska. *See* 28 U.S.C. § 1391(e)(1)(B). And even if this action were characterized as one that does not involve real property, Plaintiff resides in Alaska. *See id.* § 1391(e)(1)(C); ECF 1 ¶ 3. Granted, the Court acknowledges, and the Parties agree, venue is proper in the District of Columbia as well. ECF 10 at 4; ECF 14 at 2. Between these two forums, however, the superior forum for this action is the one where the subject matter of the dispute is located, where local interests are uniquely affected, where Plaintiff resides, and where related litigation has occurred and, indeed, is ongoing. That is to say, upon review of the public interest and private interest factors relevant to transfer, the Court finds that the DOI has met its burden in establishing that transfer to the District of Alaska would further the interests of justice and promote efficiency and convenience.

### A. Public Interest Factors

The Court will first explain why the proposed transfer is in the public interest. There are three primary public interest factors courts regularly consider: (1) the local interest in having controversies decided "at home," (2) the transferee's familiarity with the parties, facts, and governing law, and (3) the relative congestion of the transferee and transferor's dockets. *See Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996). The Court will take each of these factors in turn.

First, with regard to "[p]erhaps the most important factor in the motion-to-transfer balancing test," *see Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 116 (D.D.C. 2015), the State of Alaska has a significant and uniquely local interest in having this controversy adjudicated "at home." If it were not clear by now, the Refuge is located in Alaska, and therefore any decisions regarding oil and gas exploration in the region will have acute economic and environmental impacts in Alaska. Plaintiff is spot on in its assertion that the "Refuge is unquestionably of national rather than just local significance," ECF 10 at 11, but "there is no blanket rule that 'national policy' cases should be brought in the District of Columbia" either, *Alaska Wilderness League*, 99 F. Supp. at 117 (quoting *Starnes v. McGuire*, 512 F.2d 918, 928 (D.C. Cir. 1974)).

Nor is it clear that this action is best characterized as a "national policy" case in the first place. Recently, this Court denied a motion to transfer a dispute involving federal land located outside the District of Columbia, but it did so in large part because the case presented "a [threshold] legal question with the potential to affect the administration of national [land] throughout the country." *Wilderness Workshop v. Harrell*, No. 23-cv-678 (JMC), 2023 WL 3879505, at *3 (D.D.C. June 8, 2023). No such question arises here. The AIDEA is challenging only "the

7

[cancellation] of [its] specific . . . development lease[s]," which were issued pursuant to a specific law exclusively applicable to a specific parcel of land "that happens to be located [thousands] of miles outside the District of Columbia." *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, No. 21-cv-3276 (CRC), 2022 WL 3906934, at *6 (D.D.C. June 27, 2022); *see Raju v. Jaddou*, No. 22-cv-02308 (APM), 2023 WL 5321888, at *3 (D.D.C. Apr. 7, 2023) ("[W]hile there is national interest in USCIS's policies, there is no national interest in the applications of these particular plaintiffs."). "Moreover, even accepting that this case touches upon some national concerns, it is beyond cavil that the [Program] most *directly* affects Alaskan lands [and] livelihoods." *Alaska Wilderness League*, 99 F. Supp. 3d at 117.

Plaintiff's choice to bring this suit belies its suggestion that the State of Alaska is not uniquely interested in this case's outcome. Of course, environmental groups have "recognized the national significance" of issues relating to the Refuge, ECF 10 at 11–12, and Congress has done the same, *see* 16 U.S.C. § 3101 (emphasizing the "national significan[ce]" of "certain lands and waters in the State of Alaska"). But the AIDEA does not even purport to act on behalf of national interests—it acts exclusively "to promote, develop, and advance the general prosperity and economic welfare of the people *of the state*," Alaska Stat. § 44.88.070 (emphasis added). The AIDEA's multiyear effort to jumpstart the Coastal Plain Program is a testament to the Program's importance to the Alaskan people. The fact that "most of the oil and gas extracted in Alaska is transported elsewhere," ECF 10 at 12, "does not turn [this] otherwise local controversy into a 'national' one," *Seafreeze Shoreside, Inc.*, 2022 WL 3906934, at *6. Nor does it overcome the courts' general preference to resolve cases involving environmental regulation impacting lands, waters, and wildlife "in the forum where the people 'whose rights and interests are in fact most vitally affected' reside." *Id.* When it comes to this case, those people clearly reside in Alaska.

Second, given the multiple prior lawsuits in the District of Alaska challenging the DOI's administration of its Coastal Plain Program under the Tax Act, it is clear that the transferee court has relevant "knowledge of the parties and facts" that favors transfer. *See Ysleta del Sur Pueblo v. Nat'l Indian Gaming Comm'n*, 731 F. Supp. 2d 36, 40 (D.D.C. 2010). The AIDEA's prior (and still pending[3]) action in the District of Alaska alone provides a strong basis for transfer. The District of Alaska has already passed on several questions relevant to the AIDEA's present challenge: the scope of the DOI's discretion to provide for an oil and gas program under the Tax Act, the DOI's environmental conservation responsibilities under ANILCA, the breadth of the DOI's authority to "correct its own errors," and the intersection between the DOI's management power over public lands and the "limited nature of a leasehold interest in such lands." *AIDEA I*, 2023 WL 5021555, at *9–11, *14–15. Plaintiff may disagree with the District of Alaska's prior judgment and can seek to distinguish it in this litigation, *see* ECF 23-2, but that does not render it irrelevant.

Without a doubt, the DOI's decision to cancel rather than suspend the leases is a new agency action, but it strains reason to suggest that the AIDEA's lawsuits challenging these two decisions "bear only a marginal relationship" to one another. *Contra* ECF 10 at 14–15. As Judge Sharon L. Gleason stated herself, "it appears that Plaintiffs are seeking from the D.C. District Court much the same relief that th[e] [District of Alaska] previously denied them." Order Denying Motion to Alter Judgment and Motion to Vacate at 13, *AIDEA I*, 2023 WL 5021555, ECF 97. Granted, it is "well settled that no federal court is more competent than any other to resolve questions of federal law," *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 78

---

[3] In denying the AIDEA's motion for relief from final judgment and motion to vacate, the District of Alaska found that "th[e] case is not moot." *See* Order Denying Motion to Alter Judgment and Motion to Vacate at 13, *AIDEA I*, 2023 WL 5021555, ECF 97 (entered Feb. 22, 2024); *see also* Motion for Relief from Final Judgment, *AIDEA I*, 2023 WL 5021555, ECF 84 (filed Oct. 17, 2023, one day before the Complaint in this action).

(D.D.C. 2013), and this case involves nothing but federal questions. But the fact that the District of Alaska has yet to rule on the legality of this precise agency action does not invalidate its experience with earlier lawsuits involving similar legal issues and repeat litigants. Nor can this Court ignore the four (presently stayed) lawsuits that challenge the legality of the same Coastal Plain Program leasing actions that the AIDEA now hopes to reinstate. *Gwich'in Steering Comm. v. Haaland*, No. 3:20-cv-00204 (SLG) (D. Alaska); *Nat'l Audubon Soc'y v. Haaland*, No. 3:20-cv-00205 (SLG) (D. Alaska); *Native Vill. of Venetie Tribal Gov't v. Haaland*, No. 3:20-cv-00223-SLG (D. Alaska); *State of Washington v. Haaland*, No. 3:20-cv-00224 (SLG) (D. Alaska). The past litigation, ongoing post-judgment proceedings, and this new action all relate to oil and gas exploration on the Coastal Plain and the regulation thereof. As such, the District of Alaska's familiarity with the Parties, facts, and law involved "weighs heavily in favor of transfer." *Cf. Ysleta del Sur Pueblo*, 731 F. Supp. 2d at 41.

Finally, the relative congestion of the two districts' dockets does not clearly push in either direction. The Government points out that there are nearly 200 more cases per judgeship in this District than in the District of Alaska, ECF 7 at 15–16, while Plaintiff responds that the two districts resolve cases pre-trial at a similar rate, ECF 10 at 27. At most, the Court finds that the greater case burden per judgeship in this District slightly favors transfer, but this factor plays a minor role in the Court's analysis. In sum, despite the AIDEA's insistence otherwise, this Court finds that the interests of justice and judicial efficiency strongly favor transfer to the District of Alaska. The Court now turns to the private interest factors.

### B. Private Interest Factors

Any private interest considerations of party convenience and the like, to the extent they weigh against transfer, are insufficient to overcome the strong public interest in transfer. Private

interest factors include: "(1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof." *Trout Unlimited*, 944 F. Supp. at 16. Considerations regarding convenience and access to evidence are, as the Parties seem to agree, inconsequential in this case, which will be resolved on cross-motions for summary judgment based on an administrative record. *See id.* at 18 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)); ECF 7 at 21; ECF 10 at 24–25. With factors four through six written off as effectively neutral, the Court will briefly consider the weight of the Parties' choices and the location from which this claim arose.

The AIDEA would prefer to have this suit heard in Washington, D.C., and the Court is mindful of Plaintiff's choice. But while a plaintiff's choice "is generally given deference in determining whether a transfer of venue is justified, less deference is given to a plaintiff's choice when that choice is not plaintiff's home forum." *Ysleta del Sur Pueblo*, 731 F. Supp. 2d at 42; *see also Niagara Pres., Coal., Inc. v. FERC*, 956 F. Supp. 2d 99, 104 (D.D.C. 2013) (collecting cases). Washington, D.C., as Plaintiff acknowledges, is not the AIDEA's "home state." ECF 10 at 25. The AIDEA is a public corporation created by the State of Alaska, based in Alaska, which acts only to promote the welfare of those in Alaska. It has no ties to Washington, D.C. As such, the AIDEA's decision to file suit in the District of Columbia carries less weight, particularly where, as here, "transfer is sought to the forum with which plaintiff[] ha[s] substantial ties and where the subject matter of the lawsuit is connected to that state." *Trout Unlimited*, 944 F. Supp. at 17. Indeed, in

such circumstances, not only does Plaintiff's choice receive less deference, but "the showing *defendants* must make [to support transfer] is [also] lessened." *Id.* (emphasis added).

Moving to the next factor, the Parties dispute whether this claim is better characterized as arising out of conduct in Alaska or Washington, D.C., and perhaps for good reason. Although this case has substantial ties to Alaska, it is by no means disconnected from Washington, D.C. As Plaintiff alleges and Defendants admit, "DOI Secretary Haaland personally announced the Lease Cancellation Decision at a press event on or about September 6, 2023 and DOI Secretary Beaudreau signed the decision" while working from "DOI's Washington, D.C. headquarters." ECF 11 ¶ 11; ECF 20 ¶ 11. While Defendants deny that the actual decision-making occurred in Washington, D.C., ECF 11 ¶ 10; ECF 20 ¶ 10, Plaintiff points out that the DOI's own press release indicates that "Secretary Haaland personally made the decision," ECF 10 at 5; *see also id.* at 38 (press release stating that "Secretary Haaland has determined that the leases issued by the previous administration in the Arctic Refuge shall be cancelled"). However, "the cases make clear that signing and promulgating are not magic acts that somehow transform a transferable case into an un-transferable one," *Alaska Wilderness League*, 99 F. Supp. 3d at 116, and the Court is not persuaded that Secretary Haaland's alleged degree of involvement is substantial enough for this factor to tip the scales against transfer.

Make no mistake, the Court takes seriously the allegations that high-ranking DOI officials in Washington, D.C. were involved in the challenged action and has reviewed the caselaw Plaintiff cites in support of the proposition that "[c]ourts routinely deny motions to transfer from the District of Columbia when agency heads are involved in the underlying decision that impacted the land outside the district." *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 21-cv-1506 (ABJ), 2022 WL 20700168, at *6 (D.D.C. Sept. 7, 2022); *see also Wilderness Soc'y v. Babbitt*, 104 F.

Supp. 2d 10, 14 (D.D.C. 2000) (transfer denied where Secretary's "involvement in the DOI's review of the impact of oil and gas leasing on the environment . . . was far from routine"). But Secretary Haaland's alleged involvement, which is evidenced only by a press release and her appearance at a media event, ECF 11 ¶¶ 10–11, is just one of several factors, virtually all of which support transfer here. Put differently, even assuming that this private interest consideration supports Plaintiff, the overall circumstances of this case are distinguishable from the cases Plaintiff relies upon in which transfers were denied. *See, e.g.*, *Wilderness Workshop*, 2023 WL 3879505, at \*5 ("Here, there are no analogous parallel proceedings."); *Defs. of Wildlife v. Salazar*, No. 12-cv-1833 (ABJ), 2013 WL 12316872, at \*3 (D.D.C. Apr. 11, 2013) ("Not only do five of the six plaintiff organizations have offices in Washington, D.C., but Washington, D.C. serves as headquarters of lead plaintiffs in the two consolidated cases."); *Fund For Animals v. Norton*, 352 F. Supp. 2d 1, 2 (D.D.C. 2005) ("First, and most importantly, this Court has a long history with the facts and law surrounding this case and the prior litigation."); *Wilderness Soc'y*, 104 F. Supp. 2d at 14 ("Plaintiffs also demonstrate that they have significant ties to the District of Columbia."); *Conserve Sw. Utah*, 2022 WL 20700168, at \*5–6 (noting that "two Plaintiffs are residents in this District . . . three others have offices in the District of Columbia" *and* "three of the five defendants in this case[] oppose the motion [to transfer]").

## IV. CONCLUSION

At bottom, whatever dispute remains over whether the claim is best described as arising in D.C. or Alaska, the overwhelming weight of the public interest factors, Plaintiff's lack of connection to this District, and Plaintiff's substantial connections to the transferee district persuade this Court that transfer is appropriate. Therefore, for the foregoing reasons, Defendants' motion to

transfer venue to the District of Alaska, ECF 7, is **GRANTED**. A separate order accompanies this memorandum opinion.

      **SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: February 23, 2024